**SICILIA DI R. BIEBOW & CO.,**
**Plaintiff-Appellant,**

v.

**Ronald C. COX and Sales U.S.A., Inc.,**
**Defendants-Appellees.**

**No. 82–1443.**

United States Court of Appeals,
Fifth Circuit.

May 18, 1984.

420

Herndon & Foxman, Dallas, Tex., Stephen Schnitzer, Livingston, N.J., Morris M. Schnitzer, Newark, N.J., for plaintiff-appellant.

Hubbard, Thurman, Turner, Tucker & Glaser, L. Dan Tucker, Robert W. Turner, Dallas, Tex., for defendants-appellees.

Before REAVLEY, RANDALL and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

In this trade dress infringement case, we must determine the extent to which section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982),[1] incorporates the common law doctrine of functionality. *See Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 857 n. 20, 102 S.Ct. 2182, 2190 n. 20, 72 L.Ed.2d 606 (1982). Stated simply, "functionality" privileges the copying of designs or features that are functional. The doctrine acts to separate those configurations that may be protected as property rights or trademarks and those designs that the law will not permit any person to appropriate or monopolize. Determining whether to apply the doctrine, therefore, implicates the competing interests of trademark law—the ability of parties freely to compete in the marketplace and protection of producers' attempts to establish a distinctive identity.

Other circuits have provided differing definitions of functionality that have resulted in nonuniform application of the doctrine.[2] *See* Note, *The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act,* 82 Colum.L.Rev. 77, 80–90 (1964) (Note). Although our cases have touched on the doctrine, we now confront for the first time in this circuit the meaning and application of functionality. *See Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1083 n. 5 (5th Cir.1982).

## I. This Litigation

Sicilia Di R. Biebow & Company (Sicilia) brought suit against Ronald C. Cox (Ron or Cox) and Sales, U.S.A., Inc. (Sales) for patent infringement, breach of contract, and unfair competition under Texas law, seeking damages and injunctive relief. The district court denied preliminary injunctive relief; Sicilia later dismissed its patent claim and amended its unfair competition claim to bring it under section 43(a) of the Lanham Act. After a bench trial on liability, the district court found for Cox and Sales on both claims. We reverse the district court's judgment dismissing Sicilia's trade dress infringement claim and affirm the dismissal of Sicilia's contract claim.

In 1967 Sicilia, a producer of lemon and lime juice, entered into a contract with Smoked Foods Products (Smoked Foods), extending to Smoked Foods the exclusive right to distribute Sicilia lemon juice in the United States. The contract was subject to

---

1. Section 43(a) of the Lanham Act provides in part:

 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

2. The doctrine has been in flux since its inception. "Despite use of the functionality concept for approximately sixty years there is still no judicial agreement as to its present or proper scope." *Developments in the Law—Competitive Torts,* 77 Harv.L.Rev. 888, 919 (1964) (Competitive Torts).

annual renewal by Sicilia and provided that Smoked Foods was "not to sell, use, represent or be interested in any competing lemon juice products" while the contract was in effect. Moreover, a five-year covenant not to compete would be triggered if Smoked Foods terminated the contract without just cause. The parties amended the contract in 1975 to include lime juice and to require payment in Swiss francs rather than American dollars.

Rolf Biebow served as manager and general partner of Sicilia. Marcus Cox was the principal shareholder and de facto chairman of the board of Smoked Foods. Ron Cox, Marcus' son, held the nominal title of president, and owned approximately 20 percent of the stock. The primary role of the younger Cox, however, was as owner and manager of U.S. Marketing, Inc., which distributed Sicilia products in the southwest United States. Corporate formalities were observed between the entities, and Smoked Foods sold products to U.S. Marketing at a profit.

Smoked Foods and Sicilia maintained a harmonious relationship for ten years, but it began to deteriorate in 1977. The strength of the Swiss franc relative to the dollar made it more costly for Smoked Foods to purchase Sicilia product. The higher price resulted in a lower sales volume in the American market. During 1978 Marcus suggested that Sicilia either establish a bottling facility in the United States or allow Smoked Foods to bottle Sicilia juice under a royalty arrangement. Sicilia was not willing to make any changes.

In 1978 Ron Cox began preparations to enter the citrus juice business in competition with Sicilia products. He formed Sales, U.S.A., through which he began selling "Pompeii" lemon and lime juice in July 1979, after the contractual relationship between Marcus and Biebow had ended. Ron Cox marketed Pompeii juice, contained in bottles similar to Sicilia's, to the same brokers he had earlier supplied with Sicilia citrus juice.

Sicilia contends that Sales' Pompeii bottle infringes the Sicilia bottle design in violation of section 43(a) of the Lanham Act. Sicilia claims that (1) its trade dress is sufficiently distinctive so that a showing of secondary meaning is not required; (2) assuming that secondary meaning is required, the trade dress has acquired secondary meaning; (3) the bottle design is not primarily functional; and (4) the Pompeii trade dress creates the likelihood of confusion in consumers, and thus infringes the Sicilia trade dress.

The Pompeii bottle resembles the Sicilia bottle. We quote from the district court's comparison of the two designs:

> Both Sicilia bottles and Pompeii bottles stand upright on a pedestal-type base and contain four ounces of juice. Sicilia bottles and Pompeii bottles are the same height and the same basic shape. However, Pompeii bottles are slightly more bulbous than Sicilia bottles. Sicilia copied the shape of its bottle from that used by Biebow's father in his German business since 1956.
>
> Sicilia lemon juice bottles and Pompeii lemon juice bottles are both yellow. Sicilia lemon juice bottles have green caps; Pompeii lemon juice bottles have yellow caps. Both Sicilia lime juice bottles and Pompeii lime juice bottles are green with yellow caps.... Both Sicilia caps and Pompeii caps have thirty-six serrations.
>
> Both Sicilia bottles and Pompeii bottles are marked with leaf-shaped tags.
>
> . . . .
>
> The word "Sicilia" appears in capital letters on all bottles of Sicilia products; Pompeii bottles do not display the word "Pompeii"; however, Pompeii bottles display a design resembling a cut lemon or lime with juice flowing from it on the lower one-third of the bottle. The Pompeii design resembles a logo which Smoked Foods had used in advertising Sicilia.

The district court dismissed Sicilia's trade dress infringement claim. The court found that the Sicilia bottle design was nondistinctive and primarily functional, that Sicilia's trade dress had not acquired secondary meaning, and that no likelihood of confusion had been established.

Pompeii bottle on left, Sicilia bottle on right.

## II. Trademark or Trade Dress Protection

■ The district court indicated that, under any definition of functionality, Sicilia's bottle design was primarily functional and was therefore not entitled to protection. The court's finding of functionality also implicated the finding that the Sicilia bottle design was not distinctive. If a particular configuration or design is found to be inherently or sufficiently distinctive,[3] it cannot also be functional in the legal sense, although it may serve a useful purpose. To find legal functionality is to find that plaintiff's trade dress does not serve as a trademark and does not qualify as a protected property interest. Only when plaintiff's product dress or design rises to the level of trademark protectability—either by a showing that it is sufficiently distinctive or has acquired secondary meaning[4]—does the question of likelihood of confusion become relevant. If confusion between the products is likely, because of similarity of dress, then the second comer falsely represents that the product he is selling was produced or sold by the first comer.

■ Despite the variety of perspectives and terms of art that courts use in analyzing trademark and trade dress cases, the inquiry should be reduced to two basic questions. The first, whether a mark or dress qualifies for protection, encompasses the issues of distinctiveness, secondary meaning, and functionality. The second, whether the protected mark or dress has been infringed, is answered by applying the "digits-of-confusion" test to decide whether a likelihood of confusion exists. The question of remedy arises only after a court finds infringement of a protected property interest by another product's dress or mark that will likely confuse the consuming public as to source.

Courts have differed in applying functionality to deny protection to designs or configurations that serve some functional purpose. Some courts, for example allow the copying of features or designs that are somewhat utilitarian, even though they may be distinctive or identifying. In other words, only if the design or configuration has identification of source as its sole purpose will it be entitled to trademark protection. *E.g., Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 304 (2d Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1063 (3d Cir.1980). Other courts have realized, however, that many designs and features have both functional and identifying aspects. "Some designs adopted for the purpose of identification are not wholly useless but perform a utilitarian function." *Truck Equipment Service Co. v. Freuhauf Corp.*, 536 F.2d 1210, 1218 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) (TESCO). Thus, protection may be accorded a distinctive or identifying design, even though that design is also related to function.[5] *See, e.g., Keene Corp. v. Paraflex*

---

3. "Distinctiveness" is the term used to indicate that a mark or dress serves as a symbol of origin, and thus is protectable. Fanciful and arbitrary marks are considered inherently distinctive. "A fanciful mark is a word which is coined for the express purpose of functioning as a trademark.... An arbitrary mark consists of a word or symbol which is in common usage ..., but which is arbitrarily applied to the goods.... 1 J. McCarthy § 11:2. The same principles apply in the context of trade dress, although selection is from designs and configurations, not words. *See Chevron*, 659 F.2d at 702. Thus, a trade dress feature is distinctive if it is arbitrary or fanciful, and not descriptive or functional. Functional features cannot be protected, and merely descriptive features must have acquired secondary meaning before qualifying for protection.

4. Although secondary meaning has been variously defined, its prime element "is a *mental association* in buyers' minds between the alleged mark and a single source of the product." 1 J. McCarthy § 15:2 at 516.

5. "[W]e see nothing inconsistent between a finding that a distinctive design has become sufficiently identified with its original producer to serve as an indication of its source and a finding that the design is nonetheless not insignificantly related to its utilitarian function." *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 827 (3d Cir.1981). Having recognized that functionally-related designs may be protected, courts have held that functional aspects can acquire secondary meaning. *See id.; Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 378 (1st Cir. 1980); *TESCO*, 536 F.2d at 1218, 1219 & n. 12;

*Industries, Inc.,* 653 F.2d 822 (3d Cir.1981); *TESCO,* 536 F.2d 1210. This general trend to limit the functionality doctrine promotes the Lanham Act's purpose of protecting product distinguishability. *See TESCO,* 536 F.2d at 1215 (quoting S.Rep. No. 1333, 79th Cong., 2d Sess. 3, 4 (1946) U.S.Code Cong.Serv.1946, p. 1274); Note, 82 Colum. L.Rev. at 83–88.

Since the district court incorrectly applied the doctrine of functionality, see *infra* section III, we cannot uphold the finding that Sicilia's bottle design was not distinctive. The district court also found that the Sicilia's bottle design had not acquired secondary meaning. Such a finding, however, is not a prerequisite for Sicilia to be entitled to protection of its trade dress. As we said in *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982), proof of secondary meaning is not necessary when a trade dress is "sufficiently distinctive of itself to identify the producer." *Id.* at 702.[6] If Sales were correct in suggesting that Sicilia's bottle resembles

a lemon or lime, the design would be descriptive and a finding of secondary meaning would then be required. Sicilia's "tear-shape-on-a-pedestal" design, however, if not functional, is entitled to protection from unfair competition if the bottle design is sufficiently distinctive to serve as an identifier of source.[7]

## III. Functionality

Sales and Cox assert marketing reasons to establish the functional nature of the Pompeii bottle design. First, the bottle must be a certain height to enable the label to be seen when the bottle is displayed in refrigerated glass cases. According to Sales, if the bottle were shorter, the shelf trim would obscure the label. The Pompeii label is shaped like a leaf, with a hole that fits over the bottle's neck, underneath the cap, allowing the label to hang alongside the bottle. Second, Sales argues that for Pompeii to be marketed effectively in supermarkets, the juice bottle must resemble lemons or limes when "jumbled" in a bin, like other fruit in the produce section. Third, Sales claims that the size and volume of the bottle is, in effect, dictated by

*General Radio Co. v. Superior Elec. Co.,* 321 F.2d 857, 864 (3d Cir.1963), *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

**6.** Of course, Sicilia's *bottle* assists in the "effective packaging" of citrus juice by containing the liquid. *See Chevron,* 659 F.2d at 702. The bottle *design,* however, is our concern. *See In re Morton-Norwich Prod., Inc.,* 671 F.2d 1332, 1338 (C.C.P.A.1982).

**7.** In this circuit, sufficiently distinctive trade dress, upon use in the market, is presumed to serve as an identifier of source without proof of secondary meaning. *Chevron,* 659 F.2d at 702–03. *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 981 n. 25 (11th Cir.1983); *Westward Co. v. Gem Prod., Inc.,* 570 F.Supp. 943, 951 (E.D.Mich.1983); *Competitive Torts,* 77 Harv.L.Rev. at 914, 922–23. *But see, e.g., Black & Decker Mfg. Co. v. Ever-Ready Appliance Mfg. Co.,* 684 F.2d 546, 550 (8th Cir.1982); *Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303–04 (2d Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); 1 J. McCarthy § 8:2. The reasons for requiring proof of secondary meaning are particularly diminished when applied to distinctive packaging. First, such trade dress generally does not begin with a "primary" meaning that must be surpassed by secondary meaning for that dress

to serve as a sign of source. *See* 1 J. McCarthy § 15:2 at 521. Unlike a product's configuration, which may acquire trademark value over time and by exposure to consumers, arbitrary and nonutilitarian trade dress or packaging usually is designed to act immediately as an identifier of source. *See In re DC Comics, Inc.,* 689 F.2d 1042, 1050–51 (C.C.P.A.1982) (Nies, J., concurring); *Original Appalachian Artworks, Inc. v. Toy Loft,* 684 F.2d 821, 831 (11th Cir.1982); *Competitive Torts,* 77 Harv.L.Rev. at 914.

Another purpose for the secondary meaning requirement is to preserve the limited number of words and designs that are useful in describing goods and services. *See e.g., Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 793 (5th Cir.1983). The need to avoid monopolization of a design lessens, however, in the area of distinctive trade dress. The wide range of available packaging and design options allows a producer to appropriate a distinctive identity without unduly hindering his competitors' ability to compete. *See Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 685 F.2d 78, 81 n. 4 (3d Cir. 1982); *Chevron,* 659 F.2d at 702–03; *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950, 952 (2d Cir.1980) (applying New York law), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *Johnson & Johnson v. Quality Pure Mfg., Inc.,* 484 F.Supp. 975, 978 (D.N.J.1979).

the market. Consumers could not adequately see a smaller bottle when marketed in convenience stores, and a larger bottle would cost more, pricing the product out of the market. Sales also contends that the bulbous shape of the bottle is necessary to make the bottle "squeezable."

■ The district court cited three different standards of functionality, holding that the entire configuration of the Pompeii bottle was "primarily functional" regardless of what standard was applied. The first standard cited by the district court, *utilitarian* functionality, was developed in opinions by the Court of Customs and Patent Appeals. The court correctly stated that this functionality standard focuses on the effect protection of a design feature would have on competition. *See, e.g., In re Morton-Norwich Products, Inc.,* 671 F.2d 1332 (C.C.P.A.1982). In *Morton-Norwich,* the Court of Customs and Patent Appeals summarized its position on utilitarian functionality. The court spoke in terms of de facto functionality and de jure functionality, using the former in the lay sense. 671 F.2d at 1337. The court noted that functionality was determined in terms of *design* utility, and defined "utilitarian" as "superior in de facto function or economy of manufacture." *Id.* at 1339. In assessing whether a design is superior or necessary, the court linked the inquiry to competitive effect. A design would be considered de jure functional if it is "the best or one of a few superior designs available." *Id.* at 1341. In other words, if a certain design is essential to effective competition, it cannot be protected as a trademark.

■ The other two functionality standards cited by the district court derive from cases involving *aesthetic* functionality, which allows copying of even ornamental or nonfunctional product features because they provide the basis for much of the product's consumer appeal. Consumers often wish to purchase items or products of fanciful, nonutilitarian design without regard for the product's source. Fanciful, ornamental, or aesthetically-pleasing features of these products thus fill a consumer need, without serving as a trade-

mark or as an identifier of source. *See International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004, 1013 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Courts, including the district court in this case, have employed definitions of aesthetic functionality in cases not involving aesthetics, but utility. *See, e.g., TESCO,* 536 F.2d at 1217–18; *Bliss v. Gotham Industries, Inc.,* 316 F.2d 848, 855 (9th Cir.1963).

The district court cited the most prominent definition of aesthetic functionality, stated in *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952):

> "Functional" ... might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

This expansive definition of functionality has often been criticized as overinclusive. *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 983 n. 27 (11th Cir.1983); Note, 82 Colum.L.Rev. at 88 & nn. 84 & 85; *see generally* Note, *The Broad Sweep of Aesthetic Functionality: A Threat to Trademark Protection of Aesthetic Product Features,* 51 Fordham L.Rev. 345 (1982). Defining functionality as anything that is "an important ingredient in the commercial success" of a product would almost always permit a second comer freely to copy the trade dress of a suc-

cessful product that has accumulated goodwill. *See* Note, 82 Colum.L.Rev. at 89.

Even the Ninth Circuit has retreated from the *Pagliero* functionality standard. In *Vuitton et Fils, S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 773–75 (9th Cir. 1981), the court disagreed that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product." *Id.* at 773. Moreover, the court acknowledged that a feature that "identifies the source of the goods and incidentally serves another function may still be entitled to protection." *Id.* at 775. Young, the imitator, sought to appropriate Vuitton's reputation by imitating the Vuitton mark. "Competition is not hindered by requiring Young to develop its own distinctive design for use in the decoration of its manufactured [luggage and handbag] products, which may be much the same as Vuitton's products in shape and configuration." *Id.* at 777.

The district court also cited the functionality standard enunciated by the Third Circuit in *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822 (3d Cir.1981). The *Keene* court rejected *Pagliero*'s broad statement of functionality, finding that it shifted the balance too far toward the interest of free competition at the expense of the interest in providing incentives for "development of imaginative and attractive design." "[I]t would be unfortunate were we to discourage use of a spark of originality which could transform an ordinary product into one of grace." *Id.* at 825. Instead of looking toward the commercial desirability of the contested feature, "the inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature." *Id.*

The *Keene* court rejected as too narrow a standard that would ask simply "whether the specific design features of the product 'were competitively essential.'" *Id.* at 827. Although the court stated that a design could be considered functional even though "other shapes and designs [existed] 'which defendant could use and still produce a workable' product," it nevertheless distinguished between a product or feature that could be effectively produced in only a limited number of designs and one that had unlimited boundaries, such as a wine bottle or an ashtray. *Id.* The *Keene* court indicated that, in the latter situation, a finding of functionality would be inappropriate. *See Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.*, 685 F.2d 78, 81 n. 4 (3d Cir.1982). With an unlimited number of design options, competition would not be hindered by allowing an identifying design to be protected.

■ *Morton-Norwich, Vuitton, Keene,* and *TESCO* all suggest that an important component of functionality is whether appropriation of a design or feature will hinder competition. The district court, however, failed to make a finding regarding competitive effect or the availability of alternative designs that would satisfy equally well the functions of a squeezable bottle containing and dispensing citrus juice.

■ We particularly reject the suggestion that the doctrine of functionality insulates a second comer from liability for copying the first comer's design whenever the second comer can merely cite marketing reasons to justify the copying. For example, function did not require the Pompeii bottle to share the same dimensions as the Sicilia bottle, nor did merchandising or competitive considerations *require* Cox or Sales to adopt Sicilia's pedestal base so that Pompeii bottles would fit into Sicilia trays or racks. To define functionality in terms of commercial success or marketing effectiveness, as Sales suggests, would permit a second comer to copy the distinctive dress of a product whenever it became successful and consumers became accustomed to its dress. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 983 n. 27 (11th Cir.1983). We do not doubt that such copying would enable the second comer to market his product more effectively, but the Lanham Act does not permit that result.

■ The functionality standard that we embrace focuses on the utilitarian na-

ture of a configuration or design. Such a feature will be functional, and not entitled to trademark or trade dress protection, if it is dictated by utilitarian characteristics or by the functions that the relevant product or trade dress is intended to serve. *See In re Water Gremlin Co.,* 635 F.2d 841 (C.C. P.A.1980) (container for fishing weights); *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 376–78 (1st Cir.1980) (cylindrical cracker can); *Price Food Co. v. Good Foods, Inc.,* 400 F.2d 662 (6th Cir.1968) (cheese spread container); *In re McIlhenny Co.,* 278 F.2d 953 (C.C.P.A.1960) (pepper sauce bottle); *Johnson & Johnson v. Quality Pure Manufacturing, Inc.,* 484 F.Supp. 975, 981 (D.N.J.1979) (glass milk bottles, paper milk containers, egg cartons). The ultimate inquiry concerning functionality, however, is whether characterizing a feature or configuration as protected "will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods ...." *Morton-Norwich,* 671 F.2d at 1342.

A design that merely assists in a product or configuration's utility is not functional and may therefore be protected. *See, e.g., id.; Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203–04 (2d Cir.1979); *TESCO,* 536 F.2d at 1215, 1218. To achieve the status of "functional," a design or feature must be superior or optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function or performance.[8] *See An Analysis of the Ives Case: A TMR Panel,* 72 Trade-Mark Rep. 118, 126–28 (1982) (comments of J. Thomas McCarthy). A particular design, such as the Sicilia bottle, may serve functions demanded by the product's manufacturer, but it is not thereby rendered legally functional—and thus unprotectable—unless the design is only one of a limited number of equally efficient options and free competition would be un-

duly hindered by according that design trademark protection. For example, as the Court of Customs and Patent Appeals stated, "a molded plastic bottle can have an infinite variety of forms or designs and still *function* to hold liquid. No one form is *necessary* or appears to be 'superior.' " *Morton-Norwich,* 671 F.2d at 1342. "[T]he same functions can be performed by a variety of other shapes with no sacrifice of any functional advantage. There is no necessity to copy appellant's trade dress to enjoy any of the functions of a spray-top container." *Id.*

Similarly, a vast number of forms may accommodate the functions of a citrus juice bottle—containing the liquid, permitting one to squeeze the bottle to dispense the liquid, holding an identifying label, and possessing a flat base that enables the bottle to stand upright. *See In re Mogen David Wine Corp.,* 328 F.2d 925, 932–33 (C.C.P.A. 1964) (Rich, J., concurring). These functions do not dictate a tear-shaped plastic bottle that shares with the Sicilia bottle the same height, volume, cap, and pedestal base. At trial three other citrus juice products were introduced into evidence. The bottles all resembled lemons or limes, dispensed the juice by squeezing, and were constructed of soft plastic. Yet they all had different volumes, heights, and caps. We also note that, of the design possibilities created for Cox, several had dissimilar shapes, bases, and heights.

We think that too broad a view of functionality disserves the Lanham Act's purpose of protecting product distinguishability. *See* S.Rep. No. 1333, 79th Cong., 2d Sess. 3, 4, *reprinted in* 1946 U.S.Code Cong.Serv. 1274, 1275–76. By restricting the doctrine of functionality, we preserve the ability of producers freely to select distinguishing designs and identifying marks. By linking functionality to a find-

---

8. We acknowledge that our statement of a narrowed definition of functionality corresponds to standards earlier characterized as "traditional" or "utilitarian." *See, e.g.,* Note, *Unfair Competition and the Doctrine of Functionality,* 64 Colum.L.Rev. 544 (1964). The following "classic formulation" was written in 1914: "What makes the fight unfair is always the borrowing by the newcomer from the first maker of something not necessary to excellence of product, not required for functional perfection, yet almost invariably cleverly calculated to attract and fix the attention, or please the eye of the careless." *Id.* at 554–55 (quoting *Margarete Steiff, Inc. v. Bing,* 215 F. 204 (S.D.N.Y.1914)).

ing of competitive effect, however, we continue to promote free competition. A finding of functionality will, by definition, encompass a finding that competition would be unduly hindered unless close copying by a competitor is allowed. A finding of non-functionality, by contrast, will mean that a wide array of choices remain available to prospective competitors even though the plaintiff producer acquires a property right in a particular design or configuration.

## IV. Likelihood of Confusion

■■■ We must next assess whether the district court was clearly erroneous in finding that there was no likelihood that the consuming public would be confused by the two bottle designs. If that finding were to stand, the court's error relative to functionality could not change the result. Our cases have established a "digits-of-confusion" standard by which this finding of fact should be made. See e.g., Falcon Rice Mill, Inc. v. Community Rice Mill, Inc., 725 F.2d 336, 345 (5th Cir.1984); Chevron, 659 F.2d at 703. The principal question of likelihood of confusion focuses on "similarity of products, identity of retail outlets and purchasers, identity of advertising media, type (i.e., strength) of trademark or trade dress, defendant's intent, similarity of design, and actual confusion." Falcon Rice, 725 F.2d at 345.

The district court stated the test correctly and found that Sales and Sicilia sold similar products through similar distribution systems to similar customers at similar retail outlets and that both products were promoted by point-of-sale displays. "These factors in general point to a likelihood of confusion." The district court also found that the Sicilia and Pompeii bottles had similar designs, although it attributed little weight to this factor. The court found that Cox did not design the "Pompeii bottle with the intent of palming the Pompeii product as Sicilia lemon or lime juice," and gave little or no weight to "instances of alleged actual confusion cited by Sicilia." The dis-

trict court did not specifically address the strength-of-mark factor, but by finding no secondary meaning, the court impliedly concluded that Sicilia's mark was weak.

We agree with the district court that the first three factors point to a likelihood of confusion. We therefore turn our attention to the factors of intent, similarity of design, and actual confusion.

### A. Intent

Sicilia presented credible evidence that Cox negotiated with Charles Warriner, a manufacturer of injection-molded products, about the manufacture of a bottle similar to the Sicilia bottle. Sicilia also put on James Rousseau, a designer for the Yarbrough Company, which performed design work for Cox during the time he was searching for a bottle for his new citrus juice product. The designer testified that Cox gave him a Sicilia bottle with the instructions to create designs that would be "close, but [would] not infringe." The designer proceeded to create approximately sixteen different designs. Rousseau testified that Cox gave him the following criteria for the new bottle's design: volume (four ounces of liquid), squeezeability, and "stippling" or exterior texture. He didn't remember if he had been given height as a criterion. Several of the designs developed by the Yarbrough Company closely resemble both the actual Sicilia and Pompeii bottles.[9]

Rousseau also testified that Cox instructed him to design a bottle with a pedestal an eighth of an inch smaller than that of the Sicilia bottle so that the Pompeii bottles would fit inside Sicilia bottle trays or racks. Rousseau also indicated that he had a Sicilia rack to assist in the design process. The court interrogated Rousseau about his testimony that Cox instructed him to design a bottle that was "close, but [did] not infringe." In response to the court's inquiry regarding his understanding of infringement, Rousseau stated that, "infringement

---

9. Cox repeatedly emphasized that he wanted his bottle to look like a lemon. He also stated that

he wanted his bottle "as different as possible" from the Sicilia bottle.

is a ... blatant infringement, where it's an exact copy."

The district court failed to credit Rousseau's testimony or mention it in his findings of fact and conclusions of law. In *Chevron,* we noted that the only possible explanation for defendant's intent to copy a competitor's trade dress "as much as the law would allow" was to "cash in" on the competitor's goodwill. *Chevron,* 659 F.2d at 704. "It is ... easy for a business man who wishes to sell his goods upon their merits to select marks and packagings that cannot possibly be confused with his competitor's ...." *Id.*

 The district court indicated that a finding of intent would have to be supported by proof that Cox and Sales "deliberately attempted to 'palm off' their Pompeii product as Sicilia product." The court's search for affirmative misrepresentation and deliberate attempts to pass off Pompeii as Sicilia was unduly narrow. *See Original Appalachian Artworks, Inc. v. Toy Loft,* 684 F.2d 821, 831–32 (11th Cir. 1982). Early cases dealing with the tort of palming off or passing off, which developed from the common law tort of fraud and deceit, "imported a great deal of moral judgment into situations of trademark infringement." 2 J. McCarthy, *Trademarks and Unfair Competition* § 25:1 at 170 (1973). Today, however, "passing off is merely a single type of theory within the broad spectrum of unfair competition law." *Id.*[10] *See id.* at 172 ("Palming Off" as Rhetorical Hyperbole for Likelihood of Confusion); 1 J. McCarthy § 8:5. Our cases have often quoted language from *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004, 1010 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975): "Unfair competition is almost universally regarded as a question of whether the defendant is passing off his goods or services as those of the plaintiff by virtue of *substantial similarity* between the two, leading to confusion on the part of potential customers." (emphasis supplied). *See, e.g., Chevron,* 659 F.2d at 703; *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 192 (5th Cir.1981). It is clear, however, that in unfair competition cases we have not used the term "passing off" in the technical or limited sense of fraudulently selling one's goods as those of another. *Id.; cf. Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.,* 716 F.2d 854, 859 & n. 11 (11th Cir.1983). The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff. *See Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1159 & n. 7 (5th Cir.1982); *Chevron,* 659 F.2d at 704; *see also Brooks Shoe,* 716 F.2d at 859 n. 13.

 The district court gave two other reasons for finding no intent to infringe. First, the court stated that the Pompeii bottle's shape was dictated by its functional characteristics. Second, the court found that Cox would not have needed to employ a design firm if he had had the intent to capitalize on Sicilia's goodwill. Since the court employed an incorrect standard of functionality, we must reject the finding that Cox's bottle was dictated by function. Moreover, we do not find it inconsistent with an intent to derive benefit for Cox to provide a design firm with a Sicilia bottle and rack and to commission a "close" design. *See Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 161 (9th Cir.) (whole range of decisions in trademark infringement field illustrates conclusion "that an infringer seldom makes a Chinese copy of another's trademark, package or label"), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963).

10. Most courts today adopt the test of "likelihood of confusion" rather than the more narrow concept of fraudulent "passing off". In modern law, the necessity for any "wrongful intent" on the infringer's part has become totally unnecessary for a court to find trademark infringement or unfair competition. Thus, the emphasis of policy has shifted from punishing infringers who have evil intentions to protecting the public from being confused by the use of similar marks. 2 J. McCarthy § 25:1 at 171.

■ Another consideration is the "previous contractual or business relations between the parties." *Falcon Rice*, 725 F.2d at 345 n. 9 (quoting *Sun-Fun*, 656 F.2d at 189). "[T]his factor will usually be considered as a subcategory of 'intent.'" *Id. See id.* at 346. The trial court failed to give weight to this factor. We think that Cox's prior role as a distributor of Sicilia citrus juice provides additional evidence of his intent to trade on the goodwill of Sicilia. After Rolf Biebow and Marcus Cox terminated their relationship, Ron Cox continued to supply the same brokers with citrus juice, although he altered his product line from Sicilia to Pompeii.

The district court's finding that Cox had no intent to infringe Sicilia's trade dress is clearly erroneous.

### B. Similarity of Design

■ The district court stated that the "Sicilia bottles and Pompeii bottles are similar," and that an "ordinary consumer-purchaser of lemon juice or lime juice who intended to buy Sicilia might be confused by the overall appearance of the Pompeii bottle." We agree with these findings. The district court, however, attributed minimal weight to this factor.

The court provided two reasons for according little weight to similarity of design. Sicilia produces citrus juice under the "M" label for Migros, a Swiss supermarket chain. The "M" bottle resembles both the Pompeii and Sicilia bottles. The district court emphasized Biebow's testimony that the Migros bottle and the Sicilia bottle have not confused Swiss consumers. The district court also noted that Sicilia did not establish that its bottle had acquired secondary meaning. We question these reasons for giving little weight to a finding of similarity of design.

As we have noted, it is not necessary to prove secondary meaning when a trade dress is sufficiently distinctive to identify the product's source. *Chevron*, 659 F.2d at 702. Additionally, the district court inflated out of proportion Biebow's testimony regarding confusion among Swiss consum-

ers. Assuming the relevance of an absence of confusion among Swiss consumers to a trade dress infringement action in a regional American market, the court ignored the basis for Biebow's testimony. Biebow stated that the reason no confusion existed was that the Migros stores sell only "M" labeled products, which are either produced by Migros factories or by other companies specifically for the Migros supermarket chain. Unlike the competing products involved in the instant case, "M" and Sicilia do not compete for the same retail outlets nor would a consumer seeking Sicilia expect to find it in a Migros store. Moreover, the court inconsistently discounted Sicilia's evidence of actual confusion because no actual consumers purchasing at retail testified to confusion, while giving weight to Biebow's testimony to show that Swiss consumers were not confused between two similar citrus juice bottles.

We emphasize the trial court's finding that an ordinary consumer intending to buy Sicilia might be confused by Pompeii's overall appearance. We have stated that "[t]he touchstone under § [43(a)] is ... similarity in the *overall trade dress of the products*." *Chevron*, 659 F.2d at 704 (quoting with emphasis *Sun-Fun*, 656 F.2d at 192).

■ A side-by-side inspection of the Pompeii and Sicilia bottles reveals some differences. The Pompeii bottle is more bulbous than the Sicilia bottle; the Pompeii bottle has a design strip depicting a series of horizontally-cut lemons or limes around the lower end of the tear-drop shape while the Sicilia bottle has a design strip with the word "Sicilia" in raised lettering around the middle of the tear shape; and the texturing of the plastic differs slightly between the two bottles.

It is clear, however, that "[s]imilarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260–61 (5th Cir.) (quoting Restatement (First) of Torts § 729,

comment b (1938)), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). *See Chevron,* 659 F.2d at 704. The evidence shows that retail establishments market either the Pompeii or the Sicilia bottle. Thus, consumers are not able to compare the two bottle designs in a store. "[T]he inability [of consumers] to compare the products side by side and observe the precise differences in appearance may increase the likelihood of confusion. When making a decision to purchase the consumer must rely on memory rather than a visual comparison." *Sun-Fun,* 656 F.2d at 192.

Also, the bottles are initially viewed not individually, but as a group. In convenience stores, the bottles typically stand in a group in a refrigerated case. In supermarkets, many bottles are often "jumbled" together in a produce bin. Moreover, both bottles, including their design strips, are colored the same—yellow or green from top to bottom. When the bottles are seen from a distance of only a few feet, the design features tend to dissolve into the color, leaving only the basic impressions of color and shape.

### C. Actual Confusion

■ The district court found that Sicilia did not present evidence of actual confusion of citrus juice consumers purchasing the product at the retail level. The court also gave little weight to Sicilia's evidence of actual confusion because (1) witnesses' opinions regarding the likelihood of confusion have little probative value and (2) testimony of instances of alleged actual confusion was based on hearsay of "possi-

bly biased witnesses."[11] The court also cited, as "the only evidence on this issue," Biebow's testimony regarding no actual confusion among Swiss consumers. We fail to see, however, why Biebow's testimony regarding Swiss consumer confusion is entitled to more weight than his or other Sicilia witnesses' opinions regarding American consumer confusion between Pompeii and Sicilia bottles. *See Sun-Fun,* 656 F.2d at 191 n. 6. Biebow's testimony is equally subject to attack as an opinion coming from one who is not an ordinary consumer purchasing citrus juice at retail.

■ It is clear that the absence of evidence of actual consumer confusion is not fatal to a plaintiff's case. "It would be exceedingly difficult to detect instances of actual confusion when, as here, the goods are relatively inexpensive and their actual properties are exactly identical ...." *Chevron,* 659 F.2d at 704. Where products are inexpensive and "the goods involved are identical," "lack of actual consumer confusion should not weigh strongly against [plaintiff]." *Falcon Rice,* 725 F.2d at 347. *See Chevron,* 659 F.2d at 704–05. *Compare Falcon Rice,* 725 F.2d at 345 n. 9 ("confusion is more likely, for example, if the products in question are 'impulse' items or are inexpensive"); *with Fisher Stoves, Inc. v. All Nighter Stove Works,* 626 F.2d 193, 194 (1st Cir.1980) (woodburning stove not subject to impulse buying).

### D. Weight of the Factors

■ Although the district court recognized that "several factors indicat[e] the likelihood of confusion," it found that, on balance, there was no likelihood of confu-

11. Although testimony of actual confusion by consumers serves as the best evidence of the likelihood of confusion, *see, e.g., Chevron,* 659 F.2d at 704, other evidence of actual confusion is probative. In *Frostie Co. v. Dr. Pepper Co.,* 341 F.2d 363, 365 (5th Cir.1965), Frostie tendered proof that bottlers often delivered Frostie bottles in Dr. Pepper cartons to retail outlets. The trial court, however, refused to admit the evidence because Dr. Pepper had not committed those acts. The *Frostie* court stated that the lower court erred by not admitting the evidence to show actual confusion.

At trial and at the preliminary injunction hearing, Sicilia put on evidence that Pompeii bottles had been marketed in Sicilia trays. In the Preliminary Injunction Findings of Fact, the district court stated, "There is no evidence that Cox urged or instructed any grocer to display Pompeii products in a Sicilia tray." The trial court found that evidence that grocers placed Pompeii bottles into Sicilia trays did not establish a deliberate attempt by Cox to palm off Pompeii as Sicilia. We think, however, that this evidence was relevant to show actual confusion.

sion. This finding is clearly erroneous. Of the seven factors, five clearly point toward a likelihood of confusion. A sixth, actual confusion, does not weigh strongly against Sicilia because of the nature of the products and their low cost. In light of Cox's previous relationship with Sicilia, his instructions to design "close" to the Sicilia bottle, and the copying of Sicilia's nonfunctional tear-drop shape and pedestal base, we think that intent to infringe should weigh strongly against Cox and Sales. *See id.; Chevron,* 659 F.2d at 703–04 (intent to derive benefit from plaintiff's reputation may alone justify finding of confusion).

■■■ On remand, the district court should apply the proper functionality standard. If the court finds that the Sicilia bottle design is not functional, the court is then to make a fresh finding on distinctiveness. Only if Sicilia's trade dress is sufficiently distinctive to serve as an identifier of source will Sicilia be entitled to relief.

## V. The Contract Claim

We now turn to Sicilia's contract claim. The events precipitating the demise of the contractual relationship between Smoked Foods and Sicilia occurred in the latter part of 1978. In August, Marcus Cox solicited prices for lime juice concentrate and lime oil from a Florida producer. After learning of this request in September, Biebow sent a telex to Marcus on October 20, 1978.

Biebow ordered Marcus not to produce citrus juice in the United States, demanded answers to several questions, and issued certain directives. Biebow stated that if Marcus violated the directives, one of which was to respond to Biebow's satisfaction within approximately five days, Marcus would be deemed to have terminated without just cause and that the telex would serve as notice that Sicilia terminated Smoked Foods for just cause. Marcus replied on October 25, indicating that the telex had arrived while he was on vacation and that he was willing to discuss the situation. In late November Sicilia telexed Marcus that he had been terminated for cause for his failure to reply adequately to the October 20 telex. About a month later, Sicilia refused to fill a Smoked Foods order, stating that Smoked Foods was no longer the American distributor since Smoked Foods had been terminated for cause.

Earlier, while Marcus was suggesting alternatives to Biebow and investigating the possibility of an American operation, Biebow himself had begun to negotiate with a New Jersey broker about the possibility of distributing Sicilia product. In response to a September 29, 1978, order from that broker, Biebow shipped three containers, the first on October 19 or 20, 1978. The containers initially arrived in Canada and were transshipped to the New Jersey broker's warehouse.

Sicilia claims that Smoked Foods terminated the contract without just cause. Sicilia acknowledges that it went through the motions of terminating the contract, but insists that the contract was already "dead," having been repudiated by a letter of October 18, 1978. In that letter Marcus noted the urgency of the need for Sicilia to bottle juice in the United States in light of the shrinking sales volume. Sicilia further claims that the repudiation was without just cause and that the covenant not to compete came into effect. Sicilia argues that Smoked Foods breached the contract clause prohibiting Smoked Foods from "be[ing] interested in" a competing citrus juice product, and it contends that Ron Cox and Sales were part of the same interrelated business family, with Smoked Foods as parent. According to Sicilia, Ron Cox formed Sales to avoid the competitive restrictions in the Sicilia-Smoked Foods contract. Sicilia urges that Sales is merely another form of U.S. Marketing, which was a subsidiary of Smoked Foods, and that corporate separateness should be ignored to avoid an inequity.

On Sicilia's contract claim, the district court found that Sicilia had expressly terminated the contract either by its November 1978 telex or by that of December 1978. Since Sicilia terminated the contract, the covenant not to compete was not activated. Only Smoked Foods' termination of

the contract without just cause would trigger the non-compete covenant. The district court construed Marcus' letter of October 18 not as an anticipatory repudiation, but as merely "expressing a continuing desire to bottle Sicilia products in the United States." Even if the October 18 letter had served as a repudiation, Sicilia failed to make the showing that such repudiation could be attributed to Ron Cox.

The district court found that Smoked Foods had no ownership or financial interest in Sales, that Ron was not a party to the Sicilia-Smoked Foods contract, and that the corporations were not mere alter egos of Marcus or Ron Cox. The court therefore refused to "pierce the corporate veil," held that neither of the two non-compete provisions had been breached, and dismissed Sicilia's contract claims.

■ Neither Sales nor Ron Cox was a party to the Sicilia-Smoked Foods distribution contract. For them to be liable under any breach of the non-compete provisions, it was incumbent upon Sicilia to establish those compelling circumstances that would justify piercing the corporate veil to prevent fraud or other inequity. Because Sicilia failed to make such a showing, the district court correctly declined to disregard distinct corporateness. *See e.g., Johnson & Higgins of Mississippi, Inc. v. Commissioner of Insurance,* 321 So.2d 281 (Miss.1975); *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571 (Tex. 1975).[12] Corporate formalities were followed, and the evidence shows that Smoked Foods sold product to U.S. Marketing at a profit.

■ Assuming that Cox and Sales were obligated under the Sicilia-Smoked Foods contract, Sicilia still could not prevail on its contract claim. The district court found that neither Ron's nor Marcus' actions constituted a repudiation and that Sicilia terminated the contract. Since Smoked Foods

did not terminate the contract, the five-year covenant not to compete was not triggered. Moreover, Smoked Foods was not "interested in" a competing product while the distribution contract was in effect. Sicilia had terminated by the end of 1978, and appellees had not produced or sold any citrus juice prior to that time.

Even if Ron's preparations and plans for Sales to produce competing product coincided with the life of the Sicilia-Smoked Foods contract, Smoked Foods had no financial or ownership interest in Sales. As the district court stated, Marcus' only interest was the "natural desire to see his son succeed."

The trial court's findings are amply supported by the evidence and are not clearly erroneous. We affirm the dismissal of Sicilia's contract claim.

AFFIRMED in part; REVERSED and REMANDED in part.

12. The parties did not raise the issue of applicable choice-of-law rules governing construction of the contract, and proceeded under Texas law. The trial court noted that Mississippi law probably governed since the Sicilia-Smoked Foods contract was formed in Mississippi. The court indicated, however, that the law of the two jurisdictions did not differ as applied to this case.