**JOHNSON & JOHNSON and Johnson & Johnson Baby Products Company, Plaintiffs,**

v.

**QUALITY PURE MANUFACTURING, INC., and Quality King Distributors, Defendants.**

No. Civ. 79–1735.

United States District Court, D. New Jersey.

Dec. 11, 1979.

Arthur S. Lane, Princeton, N.J., Thomas C. Morrison, and Christine Miller, New York City (Smith, Stratton, Wise & Heher, Princeton, N.J., Patterson, Belknap, Webb & Tyler, New York City, of counsel), for plaintiffs.

Sheldon S. Lustigman, Jacob Laufer, and Steven Trost, New York City (Bass, Ullman & Lustigman, New York City, of counsel), for defendants.

## MEMORANDUM

BIUNNO, District Judge.

Complaint in this suit was filed June 14, 1979 and an order to show cause for preliminary injunction was issued the same day, returnable June 22, 1979.

On the return date, the court had affidavits from both sides, and physical exhibits of the products involved were marked, along with other items such as plaintiffs' advertisements for its products.

The manager of plaintiffs' toiletry division began testimony, but the hearing was suspended at the court's request because a criminal jury trial was in process with another one behind it to follow. Also, there had not been any discovery. Counsel were directed to proceed with the examination of witnesses as though before the court, and to inform it when all materials had been gathered. The hearing was continued to a date to be set when the parties were ready.

That hearing was held August 6, 1979, when three witnesses were heard, further affidavits submitted, and arrangements made for submission of deposition transcripts not yet typed. Decision was reserved. Further supplemental affidavits were submitted into October, 1979, at which time the court had begun an extended criminal jury trial now in its 14th week.

The complaint is in three counts. The first is for false and misleading marks and designation of origin of goods in interstate commerce under 15 U.S.C. § 1125(a), with jurisdiction under 28 U.S.C. § 1338(a).

The second count alleges unfair competition, with jurisdiction under 28 U.S.C. § 1338(b).

The third count is for alleged false description and representation of goods in interstate commerce, 15 U.S.C. § 1125(a), with jurisdiction under 28 U.S.C. § 1338(a).

Plaintiffs market a wide range of pharmaceutical and personal care products on a nationwide basis, with extensive advertising. Defendant Quality Pure is evidently a manufacturer, and Quality King a marketer, of various products including three items which are the subject of this suit, in the New York/New Jersey metropolitan area.

The three products involved are a skin oil, marketed by plaintiffs as "Johnson's baby oil", a powder marketed by them as "Johnson's baby powder", and a shampoo, marketed as "Johnson's baby shampoo."

The first count rests on a trademark, No. 1,119,048, registered May 29, 1979, for the distinctive shape of the bottle used for the oil, in International Class 3 (U.S. Class 51), for "Oil for Protecting, Soothing, or Lubricating the Surface of the Body" (Stites Aff'd., Exh. B), a banner or ribbon, No. 971,537, registered October 23, 1973, in the same classes, for "Body Lotion, Oil, Powder and Cream"; and for a label, shaped as a teardrop, with a smaller teardrop superimposed on the upper left portion, bearing the words "no more tears,", No. 791,169, registered June 15, 1965 in Class 52, for "Baby Shampoo".

The second or unfair competition count rests on a claim of use of confusingly similar trade dress for each of the same three products.

The third count of alleged false description and representation rests on a TV ad, evidently broadcast at least for the period February through April, 1979 in the N.Y. Metropolitan Area over the facilities of WNBC (Channel 4), WCBS (Channel 2), WOR (Channel 9) and WNEW (Channel 11) in conjunction with specified programs, Monday through Friday, from 9 AM to 8:30 PM. (Stites Aff'd., Exh. O). These were evidently broadcast as a 10 second commercial (story board reproduced, Stites Aff'd., Exh. P), and as a 30 second commercial (story board reproduced, Stites Aff'd., Exh. Q). The 30 second commercial is challenged because it claims that defendants' shampoo "gave me the same lather", and "both were extremely mild", in respect to plaintiffs' shampoo (portrayed on the screen) when in fact it is charged that defendants lacked a fact foundation for this comparative claim of equivalence.

Except for the TV claims mentioned in Count 3, the dispute does not involve any of the three products themselves, that is, each

side markets an oil, a powder and a shampoo, the first and third being liquids. No patent on the products appears to be involved, although there may be proprietary aspects to the formulations (see Berlin deposition, 6/27/79, pp. 44 to 51, for example).

Thus, as to the first two Counts, the issue is the classic one of "trade dress" which is independent of the functional shape or appearance of the product itself, since liquids and powders can be packaged in a broad variety of containers.

The Johnson oil is marketed in a clear plastic bottle conforming to the shape of Trademark No. 1,119,048. The oil itself is clear and colorless. The label is a vertical rectangle with rounded corners, marked with a cross-hatched band of pink across the top and bottom. The name, "Johnson's baby oil" (with "Johnson's" in script and "baby-oil" in lower case type) is printed on the upper part of the label in blue. Below that appears the trademarked ribbon or banner of Reg.No. 971,537 in pink, with the words "PURE AND GENTLE" in white capitals. Below that is "Johnson & Johnson" in blue script, and the bottle size.

Defendant's oil is in an elongated tapered bottle, also clear plastic. The label is a tapered rectangle with rounded corners. There is a pink band (not cross-hatched) across the top and bottom. The name "Quality baby oil" (with Quality in script and "baby oil" in lower case type) is printed on the upper part of the label. Below that is a slanted pink band with the words "soft and gentle" in lower case white. Below that is a statement of ingredients, the Quality Pure name and address, and the bottle size.

Color photographs appear as Exh. A (for plaintiffs) and Exh. G to the Stites affidavit. Two revised versions for defendant appear as Exh. L and M of the same affidavit. The bottle shape of Exh. L is the upright taper Exh. F. The pink bands at the top and bottom of the label have been changed to concave crescents facing each other. The ribbon or banner, which was pink with white letters has been replaced with the pink letters "soft and smooth" at essentially the same slant as before. The information as to ingredients, distributor and bottle size have been moved upward.

The label on Exh. M is about the same as for Exh. L, but the bottle shape is no longer a vertical, tapered rectangle. Instead it is very much like the shape of plaintiffs' Exh. A.

It should be noted, too, that the color balance of the photographs, Exh. A, G, L and M is not uniform in comparison to the physical exhibits. Exh. A as photographed has a blue tint not in the original, which is clear and colorless. The contents in Exh. G have a brownish cast, for some reason, while the original is clear. The color balance on Exh. L and M is a more accurate reproduction.

Turning to the powder, plaintiffs' package is a straight rectangular shape in white plastic, with a label that closely follows that of the plaintiffs' oil, except that it says "powder" instead of "oil", and the ribbon or banner says "PUREST PROTECTION", and the corners are not rounded. (Stites Aff'd., Exh. D). Thus, the labeling, graphics and colors on the oil and powder are what may be called easily recognized members of the same family. Compare Exh. A and Exh. D.

Defendants' powder is also in a straight, rectangular shape in white plastic, with a label that closely follows its oil label except that "powder" is substituted for "oil", and the ribbon says "soft and smooth" instead of "soft and gentle". In this case the defendants' label is not a tapered rectangle and is a closer imitation of plaintiffs' powder trade dress. Compare Exh. H with Exh. D. Overall, it nonetheless has the appearance of a family member with the defendants' oil label, Exh. G, Exh. L, Exh. M.

So far as major national competitors are concerned, the evidence shows that while the oils are clear and colorless, and are sold in clear plastic bottles, the bottle shapes, labels, graphics and colors are distinctively different. See Stites' Reply Aff'd., Exh. A. The same is true of the powders. One

competitor uses a pale blue plastic bottle, and the others use white or a shade of white, but the labelling, graphics and colors are distinctively different as are the bottle shapes. See Stites' Reply Affidavit, Exh. B.

The situation for the shampoo is somewhat different. Evidently, all major manufacturers use substances that are a clear, yellow liquid, packaged in a clear, transparent and colorless bottle. However, these major competitors employ entirely different bottle shapes and distinctive labelling. See Stites' Reply Affidavit, Exh. C.

On the other hand, defendants' first shampoo bottles resemble the shape of plaintiffs' bottle, and the label carries three teardrop forms with one of them bearing the words "Tear Free". See Stites Aff'd., Exh. E and Exh. I.

A later version replaces the three teardrops with three balloons or circles, one of which carries the same words. This is the label used in the TV commercial, Stites Aff'd., Exh. Q.

Plaintiffs regularly "police the trade." Field representatives who visit retail stores make observations to look for competing products with similar trade dress. When these are found, the information is reported and eventually reaches the legal staff. If the trade dress appears confusingly similar, the matter is taken up by letter request to change the trade dress. See Stites Reply Aff'd., Exh. D.

It is as a result of this activity that plaintiffs became aware, first of the shampoo and then of the powder, and finally of the TV ads. See Stites Aff'd., Exh. J.

The law in this circuit in respect to trademarks and the state law on unfair competition are essentially the same, and so Counts 1 and 2 are treated together. The law of unfair competition is extremely broad. It encompasses the subdivision of trademark infringement, and reaches out to every spe-

cies of fraud, intentional or not. Competition is encouraged, but its essence is fair play. When competition is engaged in beyond the boundaries of fair play, there is unfair competition.

■ Actual fraudulent intent need not be shown where it appears from the circumstances that the conduct complained of has a natural tendency to deceive or confuse the public in the market involved, such that they are likely to purchase one product in the mistaken belief that it is another's. See, e. g., *Evening Journal v. Jersey Pub. Co.*, 96 N.J.Eq. 54, 124 A. 767 (Ch.1924); *R. B. Davis Co. v. Sher*, 125 N.J.Eq. 316, 5 A.2d 49 (Ch.1939); *Locatelli v. Tomaiuoli*, 129 F.Supp. 630 (D.N.J.1955); *Time Mechanisms v. Qonaar Corp.*, 422 F.Supp. 905 (D.N.J.1976).

■ The reason for this rule is obvious. When a newcomer in the field adopts a trade dress confusingly similar to that of an established merchant, even innocently, or by chance, once the similarity is brought to his attention a failure or refusal to alter the trade dress to avoid the confusion is equivalent to an original and actual intention.[1]

In this case, the point is of no moment because the proofs are overwhelming, and not denied, that plaintiffs' products are widely sold in large volume throughout the country, and regularly advertised. The trade dress of each of the three products is distinctive and unique. Since defendants are in a competing business, it would strain credulity even to consider that the imitation of the three packages was innocent and accidental. No claim is made by any proofs offered by defendants that the trade dress they selected for their products was by coincidence an imitation of plaintiffs'. On the contrary, the proofs offered and argument advanced is in the form of an attempt to justify the invasion or intrusion.

---

1. This well-established equitable principle is very much like the older rule, developed in the law courts, that when a person enters upon another's land with authority, and after entering acts in excess of the authority, the wrongful act relates back to the original entry which thereby becomes a trespass *ab initio*—from the beginning. That doctrine seems to have been first formally expounded in the classic *Six Carpenters' Case*, 8 Coke 146.

■ It is no doubt true that no one may have an exclusive property right to a particular color or a particular English word of a descriptive nature. But this does not mean that a new competitor may enter the field by selecting a trade dress designed as a fraternal twin of an established and well-known enterprise which has built up a valuable good will over many years, and mislead buyers to take the new product off the shelf in the mistaken belief they have the established product. The law on the standards of the market place simply does not allow that kind of conduct, nor has it for many decades.

There is no occasion to discuss the reported decisions on the subject. Anyone familiar with the array knows that each case of this kind turns on its own facts. If there is any one expression most pertinent here, it is that of some 70 years ago, in *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F. 73 (CA2 1910):

> "It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of his competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

That observation cannot be improved, and it applies fully to this case.

■ Plaintiffs' claim is enhanced by the fact that defendants copied the trade dress of not only one, but of three products, two having labels substantially like each other, and the third being quite different. The close copying of all three is an eloquent expression of actual intent to pirate, to engage in perfidious invasion by deception of the lay public which buys the products.

Two decisions in this Circuit expressed the guidelines long ago. One is *Sawyer v. Kellogg*, 7 F. 720 (C.C.N.J.1881); the other is *Centaur Co. v. Killenberger*, 87 F. 725 (C.C.N.J.1898). The standards there expressed have not been relaxed or diminished.

While Count 3 addresses a different claim, the facts relating to it are pertinent to the claims on Counts 1 and 2. The TV commercial, aside from its basis for Count 3, demonstrates that defendants' selection of features for the trade dress of its products was focused on creating an impression of identity in the public mind between its products and those of plaintiffs. To this extent, the facts involving Count 3 have a geometric or multiplying impact on the claims of Counts 1 and 2.

For relevant precedents in the subject field, see *Bourjois v. Willingmyre*, 33 F.Supp. 837 (D.N.J.1940); *Pinaud, Inc. v. Poly Chemical*, 16 F.Supp. 414 (D.N.J.1936); *Schwahn v. Miele*, 203 F. 176 (D.N.J.1913).

The alterations made by defendants since the first protest in 1978 are found insufficient. They are negligible and they are grudging. Having been caught with a hand in the cookie jar, defendants cannot avoid the claims by taking fewer or smaller cookies. They should have never reached into the cookie jar in the first place, and having done so must keep far away from it.

On Counts 1 and 2, the court finds that the proofs and the law show a strong probability of success on the merits. A weighing in the balance of the effect of a preliminary injunction on one side or the other is clearly in favor of plaintiffs. The nature of the threatened injury, if the conduct be allowed to continue, is of the kind that is irreparable, and the public interest requires that customers be not deceived about the identity and source of the articles they buy.

Judging from the story board for the TV commercial, defendants are attempting to compete primarily on a price basis. In and of itself, competition on a price basis is entirely lawful and in fact is encouraged. It is what the better mousetrap concept is all about. But it is not fair play to sell a competing product on the basis of a lower price and at the same time use a trade dress designed and calculated to fool the customer into the belief that he is getting someone

else's product. The current trend for price competition in the field of packaged foods is a good example of unimpeachably proper competition. The containers are plain and merely carry an identification of the contents, such as "Pickled Beets", and no more. No one can be fooled by that approach.

There are features of Counts 1 and 2 that overlap Count 3. This is for the reason that defendants have made no effort to establish that the three products themselves, i. e., the oil, the powder and the shampoo, are in fact identical.

There are many products, mainly simple ones, that are inherently identical. The familiar "Arm and Hammer" Baking Soda, subcaptioned as being "Bicarbonate of Soda, U.S.P.," is an identifiable and specific article whose characteristics are specified in the U.S. Pharmacopoeia. Any merchant wishing to sell Bicarbonate of Soda, U.S.P. is free to do so, and so long as his labeling is truthful, his product is fungible with that of competitors offering the same substance according to the same standard.

This cannot be said of "oil" or "powder" or of "shampoo". Each is a name for a broad class or array of substances in the absence of further specification.

Thus, to imitate someone else's trade dress while using a broad name is to represent by implication that the contents of the package, the product being sold, are in fact the same. No attempt has been made to show that this is so.

In fact, once the package or trade dress is adopted, the marketer is free to put in it any product he chooses so long as it fits the general description. Substances that may be legitimately labeled as "oil" or "powder" or "shampoo" may consist of any one of a number of articles whose only common relationship is the label. This is a particularly important point in a case of pirated trade dress, because the pirate may in fact introduce his merchandise by filling his packages with the product of his established competi-

tor, and later on substitute something else of the same general kind but of lesser quality. In the absence of proof of adherence to some established standard, such as the specifications of U.S.P. or the established reputation of the manufacturer, the lay public is at the mercy of the merchant who pirates a known and established trade dress.[2]

Not only do defendants not deny the trade dress overall similarity (aside from arguing specific differences), but their main theme is that plaintiffs' trade dress is of a kind uniformly adopted for the industry. From this assertion it is argued that there is no secondary meaning to plaintiffs' trade dress.

The point might have some substance if the subject were milk sold in glass quart bottles as it once was, or in paper quart containers as it is sold today. Or, if the subject dealt with eggs, whose shape and characteristics are biologically determined, and which are commonly packaged in paper or plastic containers formed with recesses to nestle the shell. Even there, however, the common use of glass or paper milk containers, or of cardboard or plastic egg cartons, does not end the matter. The glass bottle, the paper carton and the egg container are all capable of being provided with a distinctive trade dress, as a visit to any neighborhood supermarket will disclose.

The issue is not that liquids and powders must be and are marketed in one or another kind of container. The evidence is that the major producers follow the rules of fair play and make the shape, labelling and other details of trade dress quite different from each other.

The exhibits offered by defendants to challenge trade dress on the issue of secondary meaning fall short of indicating industry uniformity. They are similar to each other and to plaintiffs' dress, but they are all local "house brands", like defendants', to which plaintiffs object and engage in a

---

**2.** John Ruskin is credited with the observation that: "There is hardly anything in the world that some man cannot make a little worse and sell a little cheaper, and the people who con-

sider price only are this man's lawful prey." Stevenson, "The Home Book of Quotations" (Dodd, Mead 1947), at page 1605.

suitable program to correct the unfair competition.

It is hardly new for a market leader to draw imitators, but so long as there are appropriate programs to police the trade, defendants' argument cannot stand.

Nor can it be argued that plaintiff should file suit immediately for every instance of unfair competition. It is not only proper, but encouraged, to seek correction amicably first, and file suit only where no other course is effective. This is the pattern of plaintiffs' program to protect itself, and on the record made it is not open to the claim that it is inadequate.

Nor is it open to criticism if plaintiffs conduct their program with flexibility, and allow imitators to sell out their stock of packaged product (not plain labels), without pressing for money damages. The restrained approach is a matter of discretion in the exercise of good business judgment as a course of action more likely to achieve the desired end result than a "harder" policy.

The same course was followed in defendants' case. Letters were sent, and answered with indications of willingness to comply, yet no effort was made to send plaintiffs a sketch of the proposed revised trade dress, to see if the protest had been met. Instead, defendants chose to make minor changes which still left the overall appearance much too similar and likely to confuse. It may be that this is the common attitude of marketing experts who wish to imitate as closely as possible, but the law is that they should select a trade dress that is as different as possible.[3]

If A stands on B's foot and B complains, it will not do to move an inch or two and still stand on B's toes. The evidence indicates that this is what happened here, and the court so finds.

The claims of acquiescence and laches fall for the same reasons. Defendants misled plaintiffs into the false belief that the protests would be met, when in fact the obvious purpose was to make minor changes, as proven by what was done, and yet retain a composite, overall similarity which the court finds is likely to confuse.

Defendants' effort failed when the TV ads began, and plaintiffs realized they had been walked down the garden path. Suit followed. In these circumstances, there is neither acquiescence nor laches. Defendant chose its course knowingly and intentionally, and so must bear the burden of its misguided purpose and intent.

Similarly, the court is satisfied that plaintiff is likely to establish at final hearing the secondary meaning associated with its trade dress. As noted above, major national competitors have observed the rules of fair play and have not sought any colorable imitation of trade dress for any of the three products. Such mutual respect for the interests of others is not unlike the strong presumption of validity of a patent inferred from the fact that competitors refrain from efforts to infringe a successful product for a significant period of time.

For these reasons, a preliminary injunction will be granted as to Counts 1 and 2. Defendants will be expected, if they wish to market "oil", "powder" or "shampoo" to adopt a trade dress that is as different as possible from plaintiffs'.

The claim in Count 3 is essentially one for false advertising, based on the TV commercial. Congress has provided separate and concurrent remedies for such conduct. One is a public remedy, to be enforced by the Federal Trade Commission, 15 U.S.C. §§ 45 and 52, and the other is a private remedy at the instance of a party in interest under 15 U.S.C. § 1125(a).

From the language and context of the statutes, there can be no doubt that both are aimed at the same evil, and each authorizes an independent mechanism to right the wrong.

---

3. See *Pennwalt v. Becton, Dickinson*, 434 F.Supp. 758, esp. at 764 765 (D.N.J.1977), and cases cited.

On the record presented, it is beyond question that defendants had no basis for asserting the claims they did in the TV commercial. It has, evidently, become acceptable practice in recent years to advance a product on a comparative basis with another's product, not with the anonymous Brand X, but with the name of the competitor.

Given these new rules of the game, the court is satisfied that 15 U.S.C. § 1125(a) provides a private cause of action to enjoin such advertising when the defendant has made the claim without a good faith basis, grounded on substantial pre-existing proof, to support it. Here, the evidence is plain that defendants had no good faith basis.

First, they had a "survey" conducted by having samples of the competing shampoos distributed to shoppers at shopping areas, assertedly at random, with a questionnaire to report the evaluation after trial. This process is explained in more detail in the Jankowitz affidavits, pars. 13 and 14. While Jankowitz says he personally observed the interviews, or some of them, no evidence is offered in any form to establish what substance was in bottle X or bottle Y. Thus, there is a total absence of proof of any kind of validity to this subjective survey.

Second, after the claimed results were in, one Jane Paley was selected, not from the group from the shopping areas, but for her photogenic characteristics for a TV commercial. See Jankowitz affidavit, par. 15. Again, no verification is offered to establish what was in the samples she was given. She scored them the same on all characteristics listed on the questionnaire, but for all the proof shows both samples could have been the same product, whether plaintiffs' or defendants'.

This kind of so-called "testing", without any attempt at substantiation, has far too much resemblance to three-card monte to be accepted as entitled to any weight.

It was this selected Jane Paley who was engaged to make the TV commercial, expressing what was no more than a personal, subjective opinion, interspersed with statements by an unidentified announcer. In light of common knowledge of the methods for preparing TV commercials, defendants are called upon to justify all the statements made in it on the basis of information in hand before the commercial was made. Not only have they failed to do so, but it is plain that they had no basis other than a superficial and selected one.

Substantial time and effort was devoted to discovery depositions in respect to tests of one kind or another conducted separately by both sides. The evidence in this respect is irrelevant to begin with, because none of it was in defendants' hands before the commercial was made, and it is of no value to the court on the question before it simply because the characteristics tested are difficult of evaluation, and since the supposed tests were made separately, with no observer present for the adversary, no judgment can be reached on their significance. Suffice it to say that the underlying reports of some of the tests conducted for defendants are open to legitimate contrary conclusion in respect to "foaming" qualities, and that neither before nor after suit was filed did defendants cause any recognized test of "mildness" to be conducted.

The order for injunction is to extend to media advertising asserting claims of equality or superiority of one or another quality pending final hearing.

Provision is to be made in the order for the posting of bond or other security in the amount of $20,000.

Submit order accordingly.