AROMATIQUE, INC., Plaintiff,

v.

GOLD SEAL, INC. and Darrell Bufford, Defendants.

Civ. No. LR–C–88–500.

United States District Court,
E.D. Arkansas, W.D.

Sept. 7, 1993.

742

James H. Druff, Rose Law Firm, Little Rock, AR, Michael E. Irwin, Reed, Irwin & Tilley, Heber Springs, AR, Carol S. Arnold, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, WA, for plaintiff.

Hermann Ivester, Ivester, Skinner & Camp, Stephen L. Curry, Kemp, Duckett, Hopkins & Spradley, Little Rock, AR, for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Aromatique filed suit in the Cleburne County Chancery Court on December 22, 1987, alleging trademark infringement of the trade dress for "The Smell of Christmas" and "The Smell of Spring" and unfair competition under Arkansas law. Named as defendants were Gold Seal, Inc. and Darrell Bufford. Defendants removed the case to this Court on July 22, 1988, after the filing of the second amended complaint on July 14, 1988, that added an alleged violation of the Lanham Act. Along with the removal, defendants filed a counterclaim for infringement and for cancellation of Aromatique's federal trademark registrations.

Trial was held before the Court from September 26, 1988, through October 7, 1988.

Since Aromatique had failed to introduce proof of damages, the Court dismissed plaintiff's request for an accounting. The Court also dismissed Bufford in his individual capacity and dismissed that portion of Gold Seal's counterclaim relative to infringement.

After preparation of the transcript, the parties submitted their post-trial briefs, proposed findings of fact and conclusions of law on December 28, 1990. The reply briefs were submitted on January 7, 1991.

On May 28, 1991, Gold Seal filed a motion for reconsideration of the admissibility of its Exhibit # 73. Aromatique responded to that motion on June 11, 1991, and separately moved for sanctions under Civil Procedure Rule 11 for the filing of the motion to reconsider. Gold Seal responded to that motion on June 25, 1991.

## FINDINGS OF FACT

1. This is a civil action for trademark infringement and unfair competition arising under the trademark laws of the United States, 15 U.S.C. §§ 1051 et seq. (the Lanham Act) and the law of the State of Arkansas, Ark.Code Ann. § 4–71–112(a)(1).

2. Aromatique is a corporation organized under the laws of the State of Arkansas with its principal place of business in Cleburne County, Arkansas. Aromatique is in the business of manufacturing, selling and distributing products marketed under the names "The Smell of Christmas" and "The Smell of Spring."

3. Gold Seal is a corporation organized under the laws of the State of Arkansas with its principal place of business in Cleburne County, Arkansas. Gold Seal is in the business of manufacturing, selling, and distributing products marketed under the names "Holiday Essence" and "Spring Essence." No evidence was offered at trial to prove that Bufford acted in his individual capacity with respect to the allegedly infringing trade dress.

4. The current products marketed by these parties and others contain leaves, acorns, wood chips, pine cones, and assorted other natural items to which aromatic oils are

added. The "potpourri" is used by placing it in an open container as visual decoration emitting a pleasant aroma. Refresher oils, sold separately, can be added to the "potpourri."

5. At the request of Sandra Horne, who owned a gift shop in Heber Springs, Patti Upton concocted a unique textured blend of pine cones, wood shavings, sweet gumballs, nuts and cinnamon scented oils which she called "The Smell of Christmas" during October of 1982.

6. "The Smell of Christmas" was not a traditional potpourri, but was intended to be a new category of product, a decorative room fragrance, using natural elements from the out-of-doors to be displayed in open containers in rooms.

7. Horne, who was experienced in retailing, carried many gift items in her store, including traditional potpourri, regularly attended national trade shows displaying gift items, and reviewed magazines and catalogs. Before 1982, Horne had never seen a product like "The Smell of Christmas."

8. "The Smell of Christmas" was packaged in a large and small size,[1] consisting of a clear double-cellophane bag presented in a pillow shape, with the excess cellophane gathered at the top into a "flower." The first wholesale purchase of cellophane bags for "The Smell of Christmas" package was September 14, 1982. Both the large and small packages were tied with cords in square-knot bows. The large bags had red and green rope-like cords while the small bags had either the green or the red cord. Round gold or red labels inscribed with "Merry Christmas" were used on the package.

9. In May or June of 1983, Aromatique adopted a different label for the 1983 Christmas season and placed an order for that label for delivery in July of 1983. The label, which was used for "The Smell of Christmas" during the 1983 season, was a smaller oval with a red foil background and the depiction of a reindeer head.

10. In July of 1984, Aromatique adopted the current oval red and gold foil label with the woodblock "A." Gold metallic strings, that had been considered in early 1986, were added to the square-knot bows in 1987.

11. Early in 1983, Aromatique introduced a second product, "The Smell of Spring," a decorative room fragrance with a spring scent, which was packaged in the large and small sized pillow-shaped clear double-cellophane bags, gathered at the top into a "flower" of the excess cellophane with a gold-on-gold oval label and ecru cords. Gold metallic strings were added to the packages in 1987.

12. From the time Aromatique first marketed "The Smell of Spring" in 1983, it used an oval label. The first label was blue and white with a depiction of a hummingbird on it, but that label lasted only two weeks. On February 9, 1983, Aromatique ordered a gold-on-gold oval label with the hummingbird and recalled the product with the blue and white oval label. By July of 1984, the current gold-on-gold oval label with the woodblock "A" was adopted and has been in continuous use since then.

13. The words "Heber Springs" appear prominently on the label, and the products have come to be identified with Aromatique's place of business there. The labels are attached to the inner bag before the second bag is placed on the outside.

14. Attached to each package is a hang tag with a warning about putting the product in open containers and not directly on furniture, and with instructions about enhancing the fragrances with Aromatique's refresher oil. In 1985, a non-folding hang tag was added to the packages for both products that read:

"The Smell that Remembers"

Slit bottom of bag allowing contents to fall into your favorite container.

Packaged product needs to be placed in open container as fragrance oil may damage fine finishes.

---

1. The large size contains approximately 16 ounces while the smaller size contains approximately 7.5 ounces.

15. In 1986, a folding gold hang tag was added to both packages with a change in the wording. The upper part of the tag read:

WARNING....

READ CAREFULLY....

DO NOT PLACE BAG ON YOUR FUR-NITURE OR OTHER FINISHED SUR-FACE. OILS WILL DAMAGE FIN-ISH!! *NOT* FOR CONSUMPTION. AVOID CONTACT WITH SKIN.

The lower part substituted the following language for the sentence on the 1985 tag beginning with "packaged" through "finishes":

Aromatique fragrances are long-lasting. If you wish to enhance the fragrance, ask for the Aromatique Refresher Oil.

16. Aromatique started using a wash dye on the wood shavings in "The Smell of Spring" in 1987.

17. The packages were first displayed in Horne's shop in 1982 in a large basket where no one package could be completely seen by the consumer and the product was displayed in unopened containers. These means of displaying Aromatique's products are still in use in retail stores.

18. The first interstate sale of "The Smell of Christmas" was November 5, 1982, and the first interstate sale of "The Smell of Spring" was March 7, 1983. On February 10, 1983, Aromatique incorporated in the State of Arkansas.

19. Aromatique submitted two separate applications for registration of the trade dress of "The Smell of Christmas" and "The Smell of Spring" on June 26, 1985. Both applications were initially rejected by Gabrielle Siman, the examining attorney, on August 22, 1985, because she did not believe the trade dress was distinctive and evidence of secondary meaning had not been presented.

20. The applications were amended on January 31, 1986, to claim that the trade dress had acquired distinctiveness or secondary meaning. Affidavits were submitted about the advertising and promotion of Aromatique's products; the extensive free publicity accorded Aromatique and its products; the states in which the trade dress was registered; letters from various dealers and dis-tributors attesting to the distinctiveness of the trade dress; and information as to how Aromatique protected its marks against adverse users. Siman refused registration on May 5, 1986, finding that the design appeared to be primarily functional in nature.

21. Second amendments to each application were filed on October 10, 1986, claiming that the trade dress is non-functional. Following her review of the submitted materials and interview with attorneys for Aromatique, Siman recommended that plaintiff's trade dress trademarks be published on the Public Register on March 17, 1987. The notice of publication drew opposition from Joseph M. Gyulay, d/b/a Countryside Herb Farm, but that opposition was dismissed without prejudice on March 11, 1988.

22. The trade dress trademarks were registered on the Principal Register in the U.S. Patent and Trademark Office (PTO) on June 21, 1988, with Registration No. 1,492,-855 for "The Smell of Christmas" and No. 1,492,856 for "The Smell of Spring." These registrations are prima facie evidence of the validity, ownership and exclusive rights of Aromatique to use these marks for the trade dress for their products.

23. The testimony of David Allen, a former member of the Trademark Trial and Appeal Board of the PTO for seven years, does not support Gold Seal's assertion that Aromatique fraudulently obtained the PTO's registration of the trademarks or that cancellation of the trademarks due to discrepancies in the applications and letters is warranted. For instance, he concluded that the overall commercial impression of the Aromatique package using the "Merry Christmas" label was sufficiently similar to the registered mark to permit "tacking" for purposes of priority; that the amendment "whiting out" "red or" was made by Siman or a clerk in the Trademark Operation; and that the internal inconsistencies of the supporting letters are insignificant with no evidence to support an inference of deliberate falseness.

24. Allen's testimony also rebutted Gold Seal's arguments that the registrations should be cancelled due to the trade dress being primarily functional and not having acquired secondary meaning. He pointed to

the arbitrariness of the excess material being "flowered," the double-bagging, and the knotted cords.

25. On September 20, 1985, the State of Arkansas issued certificates of trademark registration, Nos. 260–85 and 261–85, covering Aromatique's package design for "The Smell of Christmas" and "The Smell of Spring," respectively.

26. Aromatique also registered its trade dress for "The Smell of Christmas" in the following states: Alabama, Connecticut, Illinois, Kansas, Kentucky, Maryland, Missouri, Nevada, New Hampshire, Ohio, South Carolina, Tennessee, and West Virginia.

27. The trade dress for "The Smell of Spring" is registered in Alaska, Arizona, California, Colorado, Delaware, Florida, Illinois, Iowa, Louisiana, Maine, Minnesota, Mississippi, Nebraska, New Mexico, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, and Washington.

28. Since its beginning in 1982, Aromatique has received extensive publicity in newspapers and magazines in Arkansas, the United States and even internationally. Many of the articles note Aromatique's leadership position in creating and advancing the decorative room fragrance industry. Aromatique's geographical location, its product and package design have also received wide spread comment.

29. Aromatique's principal officers, Upton and Horne, and the products they created have been featured extensively in business and general circulation publications. See, Aromatique's Exhibits 1–25.

30. Aromatique spent over $562,918.00 in advertising and promoting the company and its products between February 1, 1982, and July 31, 1988. These expenditures were primarily towards "The Smell of Christmas" and "The Smell of Spring" since Aromatique's third product was not added until March of 1987.

31. Advertisements appeared in national magazines, catalogs, and other media. Aromatique and its products received exposure on television and radio programs featuring Upton and/or Horne. Additional exposure occurred through the promotional use of "The Smell of Christmas" and "The Smell of Spring" at charity events such as the American Cancer Benefit in New York City, The Dinah Shore Golf Classic, the National Wildflower Association, and other events in Little Rock, Memphis, Chicago and Texas.

32. Accounts served by Aromatique increased from zero in 1982 to 3,200 at the time of trial. "The Smell of Christmas" and "The Smell of Spring" are marketed in all 50 states, England, Europe, Canada, Mexico, Israel, Puerto Rico, Australia and Hong Kong.

33. The total retail market for home fragrance products is approximately $200–250 million; decorative room fragrances account for approximately $20 million with Aromatique the leader in the field.

34. Aromatique has licensed the right to sell a product manufactured by plaintiff utilizing the "Aromatique look" to Dillard's Department Stores.

35. Aromatique has attempted to protect its trade dress trademarks by sending numerous cease and desist letters causing those companies considered to be infringing to make changes acceptable to plaintiff. Companies changed the bags they used for packaging and changed from cords to ribbons to tie the bags.

36. Aromatique sued Constance Bess, Inc. and obtained a Temporary Restraining Order and Stipulation and Order for Consent Judgment in this Court, LR–C–85–688, on November 12, 1985, in which that defendant agreed to change its product's name and trade dress.

37. In December of 1986, Aromatique sued the Gift Box and Helen Hilton in this Court for trademark infringement. The Stipulation and order for Dismissal filed on December 12, 1987, in B–C–86–113, provided that Aromatique obtained all rights to the package trade dress used by those defendants, including whatever rights and good will those defendants owned going back to 1978. Those defendants also agreed to adopt a trade dress that would distinguish its product from "The Smell of Christmas" using ribbons going around the bag and a hang tag.

38. Aromatique has incurred over $100,-000 in expenses in defending its trademarks.

39. Bufford's parents began selling plain cedar chips in zip-lock bags in 1981 and in 1982 used florist bags tied with yarn.

40. Bufford and his family were aware of Aromatique and its products by at least 1984. His father, Frank, was found in Aromatique's warehouse in Heber Springs without authorization looking at the top of a barrel which had information on the fragrance oil used in "The Smell of Spring." As a result, Aromatique started scraping the information off the labels before discarding the oil barrels.

41. On two separate visits to the Buffords' business in the summer of 1984 to discuss whether Aromatique would be interested in buying raw materials, Aromatique employees only saw evidence of cedar chest manufacturing, not potpourri, or other items such as cellophane bags associated with those products.

42. Frank, in July of 1984, made inquiries about Aromatique's business to Paul Dial, who had made purchases of raw materials on plaintiff's behalf.

43. A few months later, Bufford spoke with Horne attempting to learn the price Aromatique paid for supplies, but he was unsuccessful. Several of Aromatique's production employees such as Joyce Biddle, Peggy Smith, Sharon Hildebrandt and Shirley Berry went to work for the Buffords, who also had relatives working for plaintiff.

44. Gold Seal was incorporated on June 3, 1985, by Bufford as President and majority stockholder and his parents, Frank and Betty, as employees.

45. Horne first saw a product consisting of a zip-lock bag with wood shavings and little flowers produced by the Buffords in the spring of 1985 at the Moonlight Market, a quick shop, in Heber Springs.

46. In July or August of 1985, Linda Warwick, a Heber Springs' commercial artist, was hired to create a trade name and design logo for Gold Seal. She created the name "NaturScent" with the butterfly and the flower under the curl of the "S." The logo was in black and white with a round gold label with black writing.

47. Later that year, Gold Seal marketed a product called "Holiday Essence" under the trade name "NaturScent" with "Spring Essence" introduced in 1986.

48. Gold Seal imitated Aromatique's trade dress detail by detail in the packaging of "Holiday Essence" and "Spring Essence" as follows:

(a) Gold Seal presented its products in pillow-shaped packages decorated with gold foil labels and contained in double-cellophane bags gathered at the top in a "flower." Gold Seal used identical or nearly identical textured gold and colored tie cords, and prominently displayed the words "Heber Springs" on the label.

(b) Gold Seal, as admitted by Bufford, used the identical words on its packages to warn about the oil and promotion of fragrance oil. The warning language was from Aromatique's 1985 flat hang tag and the fragrance promotional language was from Aromatique's 1986 folding hang tag.

(c) Gold Seal purchased the same type of polypropylene cellophane bags from the same vendor that supplies Aromatique instead of another form of cellophane bag, such as polyethylene, which is cheaper.

(d) Gold Seal used the same type of red and green cords made from polypropylene fiber in the identical shades of color as Aromatique's cords and purchased the cords from the same vendor as Aromatique.

(e) When Aromatique added a gold metallic string to its packages in 1987, it did so in part to distinguish its packages from Gold Seal's. Gold Seal copied that change and added the same type of metallic string to its packages.

(f) When Gold Seal changed from the large round serrated label to the butterfly label in 1987, Gold Seal purchased the butterfly label from the same supplier that had helped design and supply labels for Aromatique. The labels for "The Smell of Christmas" are red and gold while the labels for "Holiday Essence" are gold and red. While the labels for "The Smell of

Spring" are gold, the labels for "Spring Essence" are gold and blue.

(g) The bottle Gold Seal used for its refresher oil was identical in shape, size, and color to the bottle Aromatique used. The label of Gold Seal's bottle was black and gold while the label used by Aromatique was brown and gold. Gold Seal packaged the bottle in a box that was identical in shape and size to the box used by Aromatique.

(h) After Aromatique began applying a wash dye to some of the natural elements in its Christmas and Spring products, Gold Seal began dyeing its products.

(i) Gold Seal had a spring scent made by Inter–Continental Fragrances in Houston as a "knock off" of the oil Aromatique used to create the fragrance in "The Smell of Spring."

49. Gold Seal's market for its products is the same as Aromatique's and it sells to some of the same stores as plaintiff. Gold Seal sent a brochure with a picture of its products to customers of Aromatique. Gold Seal's packages are even displayed in stores in baskets like Aromatique's thereby obscuring the label.

50. Bruce Wesson, an expert in package design who compared the packaging of "The Smell of Christmas" and "The Smell of Spring" to "Holiday Essence" and "Spring Essence," testified that he considered the packages to be "identical" and that the apparent duplication by Gold Seal could not have been accidental, especially in a town with a population of approximately 5,000.

51. Gold Seal claims that its sales of bags of "Holiday Essence" and "Spring Essence" increased from 500 to 5,000 bags between 1984 and 1985 for an increase of 900%; from 5,000 to 20,000 bags from 1985 to 1986, for an increase of 400%; and from 20,000 to 50,000 bags sold from 1986 to 1987, for a 250% increase.

52. When Aromatique became aware of "Holiday Essence" shortly after it came on the market in the fall of 1985, Aromatique's attorney, by October 23, 1985 letter, put Gold Seal on notice that Aromatique considered Gold Seal's trade dress for "Holiday Es-

sence" to be "practically identical with that of our client" and "a clear violation of our client's trademark rights."

53. Upon receipt of the letter, Bufford retained F. W. Jeffcoat as counsel and showed him a sample of Gold Seal's product. Gold Seal agreed to make Jeffcoat's requested change to use a different ribbon on the product.

54. By letter dated October 30, 1985, Jeffcoat advised Aromatique's counsel that: "It is my opinion that the only possible infringement could be the red rope-like cord that has been used on both packages. I have advised my client to discontinue this and the company will use a multi-colored ribbon instead of the red cord." This change to "Holiday Essence" was acceptable to Aromatique.

55. Bufford testified that when the ribbon Gold Seal tried on the packages broke, defendant started using a heavy multicolored mylar cord, either green and gold or red and gold for "Holiday Essence."

56. Horne saw the heavy mylar ties on "Holiday Essence" in 1986, but did not think the product was confusingly similar in light of the large round gold label with black lettering and serrated edges.

57. In 1987, Gold Seal returned to using not only the red and green cords it had used before receiving plaintiff's letter, but it also added a metallic gold string like the one Aromatique had begun using. When it came to Aromatique's attention in the fall of 1987, that Gold Seal was using cord, a red and gold label shaped like a butterfly and dyeing its product, Aromatique put Gold Seal on notice that this new version was an infringement of plaintiff's trade dress trademarks.

58. Aromatique filed this current suit when Gold Seal did not make any changes in its package design.

59. Aromatique, through the testimony of Maysie Miller and Charles Claxton, established actual confusion by customers of plaintiff's and defendant's products. Miller testified that in 1986 when she was selling Gold Seal's "Holiday Essence" and "Spring Essence" at a North Little Rock mall, a customer tried to return Aromatique's product to her Gold Seal display, and she heard others

commenting that the display must be Aromatique from Heber Springs.

60. By the testimony of Sharon Johnson, a lay witness, and the expert opinions of Wesson, Allen and Nancy Bradshaw, an expert in retailing, Aromatique demonstrated the likelihood that customers would be confused by the overall impression of similarity of the products. Bradshaw established that while some of the other competitors of Aromatique might use some of the same elements, only Gold Seal has contrived packaging to be similar and confusing.

61. Although the Court questions both the utility and aesthetics of some of the cellophane alternatives proposed, Aromatique did show, through its expert and lay witnesses, that there are numerous other ways to package potpourri or decorative room fragrance factoring in expense, visibility, and aroma.

62. Thus, upholding the protection of the *combination* of the elements composing Aromatique's trade dress would not hinder competition in the potpourri/decorative room fragrance industry.

63. Gold Seal's May 28, 1991 motion for reconsideration of the admissibility of its Exhibit # 73 is denied. As stated at trial, the August 1, 1988 Upton letter is inadmissible as an offer of compromise under Rule 408, Federal Rules of Evidence.

64. Aromatique's June 11, 1991 motion for sanctions under Civil Procedure Rule 11 is denied. Although rejecting Gold Seal's motion for reconsideration, the Court does not find that Gold Seal's argument was not made in good faith.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter.

2. In a trademark infringement action, success on the merits requires proof of the validity of the marks in issue and whether the infringing mark is likely to cause confusion. 15 U.S.C. § 1114(1)(a); *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244 (8th Cir.1990).

3. Aromatique owns the trade dress trademarks registered on June 21, 1988, on the Principal Register in the PTO as Registration No. 1,492,855 for "The Smell of Christmas" and No. 1,492,856 for "The Smell of Spring." These registrations are prima facie evidence of the validity, ownership and exclusive rights of Aromatique to use these marks for the trade dress for their products in commerce. 15 U.S.C. §§ 1057(b) and 1115(a).

4. Registration under the Trademark Act is designed to "provide national protection for trademarks used in interstate and foreign commerce." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985). Registered trademarks should receive the greatest national protection that can be provided. *Id.*

5. Aromatique's federal registrations are presumptive of secondary meaning of its trade dress trademarks; *Iowa Farmers Union v. Farmers' Educational & Co-op Union*, 247 F.2d 809 (8th Cir.1957); and constitute prima facie evidence obligating Gold Seal to rebut a "strong" presumption of the mark's validity. *Liberty Mut. Ins. Co. v. Liberty Ins. Co.*, 185 F.Supp. 895 (E.D.Ark. 1960).

6. These registrations shift the burden of proof to Gold Seal to rebut the presumption of Aromatique's exclusive rights in the trade dress trademarks. *Four Seasons Hotels Ltd. v. Koury Corp.*, 776 F.Supp. 240 (E.D.N.C.1991).

7. The registrations protect Aromatique's trade dress trademarks despite minor variations between the drawings of the marks in the registrations and the marks in actual use. The scope of protection of Aromatique's registered trademarks is not limited to an exact replication of the marks as they appear on the registrations. *Armstrong Cork Co. v. Armstrong Plastic Covers Co.*, 434 F.Supp. 860 (E.D.Mo.1977). Insignificant variations in trade dress following registrations do not preclude the presumptions set forth in the statute.

8. As a result of Aromatique's exclusive use, substantial promotion, advertising and sales, Aromatique's trade dress trademarks have acquired secondary meaning. *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791 (9th Cir.1982). In addition, the proof of actual confusion is an indication that Aromatique's marks have acquired secondary meaning. *Id.*

9. Gold Seal intentionally copied Aromatique's trade dress because of Aromatique's good reputation in the field of decorative room fragrances. Gold Seal's attempt to capitalize on Aromatique's reputation is significant evidence of Aromatique's secondary meaning. *Harlequin Enterprises Ltd. v. Gulf & Western Corporation*, 644 F.2d 946 (2nd Cir.1981).

10. While the Court has noted in its findings that the products are not identical in every respect, similarity of design involves an inquiry into the *overall* similarity of the products' trade dress. *Tootsie Roll Industries, Inc. v. Sathers, Inc.*, 666 F.Supp. 655 (D.Del.1987). Aromatique has confirmed that the trade dress of Gold Seal's products in issue are substantially similar in appearance to Aromatique's registered trade dress trademarks.

11. Just as Gold Seal's intent to copy overall appearance of Aromatique's products gives rise to an inference of secondary meaning, such intent also implies a likelihood of confusion. *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 619 F.Supp. 1204 (D.N.J.1985). Gold Seal failed to demonstrate an absence of consumer confusion. *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134 (2nd Cir.1991).

12. In addition, Aromatique has met the correct test for consumer confusion through its lay and expert testimony by showing that the products create the same general overall impression rather than whether the products can be differentiated in a side-by-side comparison. *Direct Marketing of Virginia, Inc. v. E. Mishan & Sons, Inc.*, 753 F.Supp. 100 (S.D.N.Y.1990). Even a little evidence of actual confusion is strong evidence of likely confusion. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir.1971).

13. Factors considered in concluding the likelihood of confusion issue are the strength of Aromatique's mark, the similarity of Aromatique's and Gold Seal's marks, Gold Seal's intent to "pass off" its goods as those of Aromatique's, the type of product along with its cost and conditions of purchase, the products' competitive proximity, and incidents of actual confusion. *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577 (2nd Cir.1993); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033 (2nd Cir.1992).

14. Aromatique has established the strength of its marks by: (i) its presumptively valid federal registrations; (ii) the establishment of secondary meaning before the PTO; (iii) the substantial evidence of extensive public exposure to Aromatique and its products through advertising, promotion and unsolicited publicity in both trade and general publications that reinforces Aromatique's claim of secondary meaning; and (iv) credible testimony from lay and expert witnesses as to Aromatique being the first to market decorative room fragrances, Aromatique's reputation and its exclusive use of its trade dress trademarks.

15. Aromatique's actions to protect its marks through cease and desist letters and litigation which led to changes in packaging by competitors had the effect of maintaining the significance of its marks. *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755 (C.C.P.A.1982).

16. Bufford's testimony that he copied the wording on Aromatique's package, in addition to other acts Gold Seal took to copy Aromatique's trade dress, raises an inescapable inference of confusing similarity. *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.1976) cert. denied 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

17. Gold Seal's choice of Aromatique's trade dress with knowledge of Aroma-

tique's success and the expenditure of over $562,000.00 in advertising and promoting Aromatique also raises "an inference . . . of an intent to cause confusion." *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1547 (11th Cir.1984) reh'g denied 731 F.2d 891 (11th Cir.1984).

18. Where, as here, both parties' products are relatively low in price and frequently bought as an impulse purchase, they are not likely to be examined at length by prospective purchasers, which is an important factor to be considered in evaluating the likelihood of confusion. *Miller Brewing Co. v. Carling O'Keefe Breweries, Ltd.*, 452 F.Supp. 429 (W.D.N.Y.1978).

19. Because of the way these products are often displayed in baskets or bins and are available in a few of the same stores, even a knowledgeable purchaser of decorative room fragrances is likely to be confused by Gold Seal's use of trade dress and be mislead into an initial interest in Gold Seal's products when seeking Aromatique's. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2nd Cir.1987).

20. Even if potential purchasers are advised that Gold Seal is not associated with Aromatique, the initial confusion works a sufficient trademark injury. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2nd Cir.1975).

21. Actual confusion by members of the retail community and the public concerning the competing products at issue here has occurred and constitutes strong evidence of the likelihood of confusion. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665 (8th Cir.1987).

22. Gold Seal failed to establish by clear and convincing evidence that Aromatique committed fraud upon the PTO. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666 (7th Cir.1982). Moreover, there was no showing of a deliberate attempt to mislead the PTO into registering the marks. *Id.*

23. Regarding the first use of Aromatique's trademark, "[t]he claim of a date of first use is not a material allegation

as long as the first use in fact preceded the application date." *Pony Express Courier Corp. v. Pony Express Delivery Service*, 872 F.2d 317, 319 (9th Cir.1989). It is uncontroverted that Aromatique's first use of each product at issue preceded the date applications for trademark registrations were filed and Aromatique had obtained whatever rights Helen Hilton d/b/a The Gift Box had in her product's trade dress back to 1978.

24. Gold Seal bore the burden of establishing the date of first use of its products, but failed to do so. The evidence disclosed that Aromatique established secondary meaning for its products before Gold Seal marketed the infringing products at issue here in 1987.

25. Gold Seal had no substantial investment in its product nor ran any ads before receiving Aromatique's first objection dated October 23, 1985 to the package used on the 1985 version of Gold Seal's "Holiday Essence." After agreeing in 1985 to change its trade dress, Gold Seal in 1987 duplicated Aromatique's trade dress even more closely than it had in 1985.

26. There was no evidence of fraudulent intent connected with the irregularities in certain of the supporting affidavits submitted to the PTO, and, even if there were, it would not be material to a finding of registrability according to Allen's testimony, especially in light of the uncontroverted evidence that at least ten of the letters were satisfactory. *West Indian Sea Island Cotton Assn. v. Threadtex, Inc.*, 761 F.Supp. 1041 (S.D.N.Y.1991); *Gear, Inc. v. L. A. Gear California, Inc.*, 670 F.Supp. 508 (S.D.N.Y. 1987).

27. Gold Seal did not prove that Aromatique's trade dress is not worthy of protection because it is functional. *Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co.*, 963 F.2d 628 (3rd Cir.1992). Elements of trade dress may have utilitarian attributes yet still be deemed to be nonfunctional where alternative designs are available that achieve the same utilitarian ends. *Keystone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 792 F.Supp. 1552 (D.Or.1991) aff'd in

part and rev'd in part on other grounds 997 F.2d 1444 (Fed.Cir.1993).

28. A feature of trade dress is nonfunctional when it is adopted for purposes of identification and individuality and not because it is related to basic consumer demands in connection with the product. *White Swan, Ltd. v. Clyde Robin Seed Co.*, 729 F.Supp. 1257 (N.D.Cal.1989). Furthermore, functional elements that are separately unprotectible can be protected together as part of trade dress so the focus for functionality is not on just the individual elements, but on whether a distinctive visual impression has been created. *Id.*

29. Gold Seal has failed to meet its burden of proof to establish estoppel by laches. *Gaston's White River Resort v. Rush*, 701 F.Supp. 1431 (W.D.Ark.1988); *Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975 (D.N.J.1979); *Dymo Industries, Inc. v. Monarch Marketing Systems, Inc.*, 474 F.Supp. 412 (N.D.Tex.1979). Furthermore, laches as a defense is inapplicable in light of Gold Seal's intentional infringement of Aromatique's marks. *Menendez v. Holt*, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir. 1985).

30. Gold Seal failed to establish that Aromatique acted with unclean hands or pirated any prior user's trade dress trademarks. Instead, Gold Seal is barred from relying upon equitable defenses by its own unclean hands.

31. Aromatique has also documented its entitlement to relief under 15 U.S.C. § 1125. Aromatique has established by a preponderance of the evidence that its trade dress is non-functional, has acquired secondary meaning, and is likely to be confused with Gold Seal's trade dress. *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) reh'g denied — U.S. —, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992).

32. Aromatique has proven its cause of action under the law of unfair competition against Gold Seal for marketing its products in deceptive and confusingly similar form. *Frito–Lay, Inc. v. So Good Potato Chip Co.*, 540 F.2d 927 (8th Cir.1976).

33. Aromatique has established infringement under Ark.Code Ann. § 4–71–112(a)(1), (2) by Gold Seal for using a copy of "colorable imitation" of a registered mark in connection with the sale or advertising of goods in a manner likely to cause confusion or to deceive.

34. The Court has the power to grant injunctions according to the principles of equity. 15 U.S.C. § 1116(a).

35. The balancing of equities clearly favors Aromatique especially where Gold Seal was first notified of its infringement while in the start-up phase of its product. *Horizon Financial, F.A. v. Horizon Bancorp*, 2 U.S.P.Q.2d 1696 (E.D.Pa.1987). Prior to October 23, 1985, when Aromatique first objected to Gold Seal's use of its trade dress, Gold Seal had virtually no investment in the trade dress, and had agreed to change its trade dress. Two years later in 1987, Gold Seal was marketing a product that not only had the admittedly infringing cords, but also a label that more closely duplicated Aromatique's and had added a gold metallic string like the one Aromatique had added in the intervening years.

36. Any investment Gold Seal may have had in the trade dress after being notified of Aromatique's objection in 1985 was a calculated risk, especially given Gold Seal's resumption of intentional infringement in 1987. *McDonald's Corp. v. McBagel's Inc.*, 649 F.Supp. 1268 (S.D.N.Y.1986).

37. As found at the close of plaintiff's case, Aromatique's request for an accounting was dismissed since no proof of damages had been introduced. However, an infringer can be enjoined from further violations of the Trademark Act even when the plaintiff has failed to show immediate pecuniary damages. *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753, n. 7 (8th Cir.1980).

38. Gold Seal and its agents, servants and employees are, jointly and severally, permanently enjoined from infringing in any man-

ner the trademark and proprietary rights of Aromatique and from selling or distributing any material under the proprietary marks and trade dress owned by Aromatique or any marks, designations, or trade dress likely to be confused with those of Aromatique.

39. Gold Seal and all those in privity are ordered to deliver for destruction all violative packaging copied or derived from Aromatique as well as all infringing reproductions of any trademarks and proprietary designations of Aromatique.

40. Gold Seal is directed to publicly notify all of their customers and potential customers that it is not connected in any way, sponsored by, or associated with Aromatique.

41. Aromatique is declared to be the exclusive owner of the trademarks, trade dress, and proprietary markings utilized in the sale and distribution of its products.

42. Gold Seal's deliberate infringement makes this an exceptional case entitling Aromatique to reasonable attorney's fees. 15 U.S.C. § 1117; *Goodheart Clothing Co. v. Laura Goodman Enterprises, Inc.*, 962 F.2d 268 (2nd Cir.1992); *Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710 (8th Cir.1980). Aromatique is directed to submit an itemization of fees and costs along with supporting documentation within twenty days of the file-date of this order. Gold Seal will then have twenty days to respond.

IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the memorandum opinion and order filed this date, judgment is granted in favor of Aromatique and against Gold Seal. Gold Seal and its agents, servants and employees are, jointly and severally, permanently enjoined from infringing in any manner the trademark and proprietary rights of Aromatique and from selling or distributing any material under the proprietary marks and trade dress owned by Aromatique or any marks, designations, or trade dress likely to be confused with those of Aromatique. Gold Seal and all those in privity are ordered to deliver for destruction all violative packaging copied or derived from Aromatique as well as all infringing repro-

ductions of any trademarks and proprietary designations of Aromatique. Gold Seal is directed to publicly notify all of their customers and potential customers that it is not connected in any way, sponsored by, or associated with Aromatique. Aromatique is declared to be the exclusive owner of the trademarks, trade dress, and proprietary markings utilized in the sale and distribution of its products. Aromatique is entitled to reasonable attorney's fees under 15 U.S.C. § 1117.